UNITED STATES BANKRUPTCY COURT      **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| BALCO EQUITIES LTD, INC., | : | Case No. 04-35777 (CGM) |
| HADDON HOLDINGS LTD., | : | (Jointly Administered) |
| SARAH ENTERPRISES | : | |
| INTERNATIONAL LTD., | : | |
| | : | |
| Debtors. | : | |

---------------------------------------------------------------x

| | | |
|---|---|---|
| | : | |
| PAUL BANNER, Trustee, | : | Adv. Proc. No. 05-9045 |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | |
| | : | |
| COHEN, ESTIS AND ASSOCIATES, LLP, | : | |
| | : | |
| Defendant. | : | |
| | : | |

---------------------------------------------------------------x

## MEMORANDUM DECISION (1) DENYING ALL FEES TO COHEN, ESTIS AND ASSOCIATES, LLP, (2) DISGORGING RETAINER SUBJECT TO FURTHER DETERMINATION BY THE COURT, AND (3) SUSTAINING RULING ON MOTION FOR RECONSIDERATION

## A P P E A R A N C E S

Mark D. Glastetter, Esq.
DEILY, MOONEY & GLASTETTER, LLP
8 Thurlow Terrace
Albany, New York
*For Paul L. Banner, Trustee*

Richard L. Weisz, Esq.
HODGSON RUSS LLP
677 Broadway, Suite 301
Albany, New York
*For Cohen, Estis and Associates, LLP*

Eric J. Small, Esq.
OFFICE OF THE UNITED STATES TRUSTEE
74 Chapel Street
Albany, New York

Anthony C. Carlini, Jr., Esq.
CORBALLY, GARTLAND AND RAPPLEYEA, LLP
35 Market Street
Poughkeepsie, New York
*For Antonina Warmers Caston, Daniel Sturrup and Burt Sturrup,
as beneficiaries of the Tessie Warmers Trust No. 1*

Michael L. Carey, Esq.
JACOBOWITZ & GUBITS, LLP
158 Orange Avenue
Walden, New York
*For Epic Orange, LLC*

**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

On April 11, 2006 this Court issued an oral ruling, later reflected in an order dated April

26, 2006 (ECF Docket No. 329), denying all professional compensation requested by Cohen,

Estis and Associates, LLP ("Cohen Estis") on its first and final fee application for attorneys' fees

of $113,707, but allowing the reimbursement of $2,517 in expenses.[1]  The April 26, 2006 order

also directed Cohen Estis to disgorge $42,483, the balance of the retainer received by Cohen

Estis after deduction of the allowed expenses (the "Retainer"), to be held by the Chapter 7

Trustee pending further order of the Court.

As discussed below, at the time of the bankruptcy filing, and even after the filing, the

Cohen Estis firm had a series of actual conflicts of interest and connections with parties in

interest, and Cohen Estis concedes that it was not a "disinterested person" as that term is used in

11 U.S.C. § 101(14).  In summary, Cohen Estis failed to disclose that it represented (1) the

---

[1]     The Court sustained the Chapter 7 Trustee's objection to the expense of $3,294.37 for six hours
of computer-assisted research, and payment of $2,000 to Lewis D. Wrobel as substitution counsel to the
Debtor.

principal and largest unsecured creditor, and (2) another major creditor, of which the largest

unsecured creditor was the former executor.  Both of the creditors are adverse to each other and

to the bankruptcy estate.

      Although Cohen Estis – and particularly its principal Ronald J. Cohen – was aware of the

conflicts of interest and relationships with major parties in interest at the time of this Chapter 11

filing, those connections were not disclosed until much later.  For example, none of the following

disclosures were made prior to Cohen Estis's retention as counsel to the Debtors:

- Cohen Estis previously represented the Debtors' principal, Donald Boehm
  individually in numerous matters, including litigation in Supreme Court,
  King's County (discussed below); and defended Boehm and his wife in
  proceedings to foreclose on their personal residence, which also served as
  collateral for the Debtors' largest secured creditor, Hudson United Bank
  ("Hudson" or "HUB").  These connections were not disclosed for nearly eight
  months, notwithstanding the fact that Boehm signed two of the petitions as
  president and appeared and testified before this Court on behalf of the Debtors
  on numerous occasions.  Boehm was at one pointed listed as a creditor in the
  Debtors' schedules and later filed unsecured claims in excess of $4 million.

- Cohen Estis represented the Estate of Frederic J. Warmers (the "Frederic
  Warmers Estate") from March 2003 until at least November 2003 when
  Donald Boehm was removed as executor of the Frederic Warmers Estate, for
  cause, by order of the Surrogate of Orange County.  The Frederic Warmers
  Estate was listed as a creditor in the Debtors' schedules and filed secured
  claims for $1,420,000 and $1,266,079.50 in the Balco estate.  In connection
  with its secured claims, the Frederic Warmers Estate is currently asserting a
  constructive trust over the only significant asset remaining in the Debtors'
  bankruptcy cases based on the claim that Boehm improperly allowed the
  property to be transferred to Balco for nominal consideration while he was the
  executor of the Frederic Warmers Estate.

- Cohen Estis continued to provide services to the Frederic Warmers Estate
  after November 2003.  On March 8, 2004, less than one month prior to this
  bankruptcy filing, Cohen Estis filed an accounting in the Surrogate's Court on
  behalf of the Frederic Warmers Estate listing as estate assets certain secured
  long-term notes from Haddon Holdings Ltd. ("Haddon"), one of the Debtors
  in this case.  Cohen Estis sought reimbursement of fees and expenses
  approximating $28,000 from the Surrogate's Court after filing this Chapter 11
  case, but did not disclose the relationship to this Court until months later.

- Cohen Estis defended Boehm and two non-debtor entities owned by Boehm,
  LMAD, Inc. ("LMAD") and Connelly Industries, Inc. ("Connelly Industries"),

in state court litigation in Supreme Court, Kings County. In a decision rendered in that case in August 2003 the Supreme Court Justice held Boehm in contempt of court for transferring $96,000 from the Plaintiff to Connelly Industries and, thereafter, to Haddon.

- Cohen Estis served as counsel to the Tessie Warmers Trust in connection with a real estate transaction that closed in April 2004. Donald Boehm was the trustee of the Tessie Warmers Trust. Connelly Industries received a portion of the proceeds of the real estate sale.

- Cohen Estis most recently claims that it received the Retainer as part of a $68,500 fee from either Connelly Industries or the Tessie Warmers Trust on April 27, 2004 in connection with the Tessie Warmers Trust real estate transaction.

- Cohen Estis previously reported receipt of the Retainer from Donald Boehm.

Given the foregoing, and other circumstances set forth below, the Court is compelled to deny all compensation to Cohen Estis. Cohen Estis does not dispute the facts as outlined above, and it is impossible for this Court to believe that the failures were anything other than deliberate. Nonetheless, Cohen Estis argues that it should be awarded compensation because "we only tried to generate a dividend for unsecured creditors and therefore acted consistently with our fiduciary duty to the Debtor, the estate and its creditors." Supplemental Statement of Ronald J. Cohen, ¶9. True or not, such an intention cannot excuse the requirements mandated by the Bankruptcy Code and Federal Rules of Bankruptcy Procedure to disclose potential and actual conflicts and connections, as well as the source and amount of compensation; to rule otherwise would render all professional disclosure obligations meaningless.

This decision discusses Cohen Estis' acts and omissions in the context of the troubled bankruptcy history of these Debtors, the collateral litigation that the Debtors' bankruptcy filing spawned, and Cohen Estis's connection with the pre-petition activity between these Debtors, their principal Donald Boehm (also a Debtor in a case before this Court under Chapter 7 Case No. 05-35105 and the defendant in *Hudson United Bank v. Boehm*, Adv. Proc. No. 05-9016 and *Estate of Fredric J. Warmers et al. v. Boehm*, Adv. Proc. No. 05-9026); Boehm's non-debtor

entity Connelly Industries (*see Banner v. Connelly Industries*, Adv. Proc. No. 06-9036); as well
as other parties in interest that are adverse to the Debtors, including the Frederic Warmers Estate,
and Epic Orange, LLC ("Epic Orange").  In the second part of this decision the Court sets forth
the reasons for denying compensation to Cohen Estis and ordering disgorgement of the Retainer
prior to allowing Cohen Estis to present evidence.  As explained below, before determining to
whom the Retainer should be disgorged, the Court will schedule a hearing to consider evidence
from all interested parties, including Cohen Estis.

## JURISDICTION

This Court has subject matter jurisdiction over this adversary proceeding and fee
application pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of
Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984.  Matters
concerning the administration of the estate and orders to turn over property of the estate are "core
proceedings" under 28 U.S.C. § 157(b)(2)(A) and (E), respectively.

## BACKGROUND FACTS

Except where otherwise noted, the following facts are undisputed.

### I.    Debtor's Chapter 11 Cases

####       A.    Petitions and Schedules

Cohen Estis filed petitions for the Debtors on March 31, 2004, each under Chapter 11 of
the Bankruptcy Code.  The initial petition for Balco Equities Limited, Inc. (Case No. 04-35777;
hereafter, "Balco") was signed by "Nancy Clark" as President of Balco, and by Andrew S.
Wulfman, an associate with Cohen Estis.  The corporate resolution, identifying Balco as a

Delaware corporation, was signed by "Nancy M Cook," as President of Balco (ECF Docket No. 2). Haddon's petition (Case No. 04-35778) was signed by Donald P. Boehm as "President", and by Mr. Wulfman as counsel. According to Haddon's corporate resolution (ECF Docket[2] No. 2), which Mr. Boehm signed as the "Director," Haddon is a "Cayman Corporation," apparently referring to the Cayman Islands. The petition for the third Debtor, Sarah Enterprises, International (Case No. 04-35779; hereafter, "Sarah"), was also signed by Mr. Boehm as "President" and by Mr. Wulfman as counsel. Mr. Boehm signed Sarah's corporate resolution (ECF Docket No. 2) as the "Director" and identified Sarah as a "BVI Corporation," apparently referring to the British Virgin Islands. Each of the three Debtors listed their address as 120 Quassaick Avenue, New Windsor, New York.

The list of equity security holders filed April 16, 2004 (ECF Docket No. 40) identified the Nancy Cook Family Trust as the owner of all of the outstanding shares of Balco. In her "Affidavit Pursuant to Local Bankruptcy Rule 1007-2" (ECF Docket No. 12) filed in each of the Debtors' cases, Nancy Cook stated the following:

– Balco is the sole shareholder of Haddon, and Haddon is the sole shareholder of Sarah.

– Balco "is the owner of real estate located in New Windsor, New York, having a value of approximately $1.1 to $1.8 million" (the "New Windsor Property").

– Haddon is the owner of "a certain ocean going vessel, being the 'Motor Yacht (M/Y) Dauntless'" (hereafter, "Dauntless").

– The Dauntless: "was purchased as a commercial survey vessel and completely gutted and reoutfitted to a luxury yacht, taking two years to complete. The 'Dauntless' is completely fitted for sail on the high seas. The vessel has been appraised for $4.2 Million and is presently listed for sale on the world market for $3.6 Million (U.S. Currency) and is suitable for charter service on a contract basis at $35,000 per week."

– Sarah is the owner of "a certain ocean going Commercial Tug, being the 'Robust'" (hereafter, "Robust").

---

[2]    Except where otherwise indicated, all references to the "ECF Docket" are to the docket in the lead case, No. 04-35777.

– The *Robust* is described as: "a 178 foot commercial tug boat built for the British Royal Navy in 1974 with a Gross Weight of 1037 tons. She accommodates a crew of 27 andwith [sic] a cruising range of 12,000 miles is conducive to long ocean towing. According to a survey performed in August of 2001, she is valued at between $1.3 and $1.6 Million with an estimated $28 Million[3] to rebuild. The 'Robust' has been listed for sale on the world market for $1.2 million US. The tradgety [sic] of September 11, 2001 has produced a soft market which has lengthened the market time of the vessels."

Nancy Cook's Rule 1007-2 affidavit states: "The Debtor's assets are subject to a blanket lien in favor of a [sic] the Secured Lenders," who are identified in Exhibit B to her affidavit as Hudson, with a total lien of $3.2 million, and NRLP, with a total lien of $1 million. Schedule D to the Balco petition revealed that Hudson was a secured creditor with a claim for $3.4 million. According to Schedule D, Hudson's claim, which Balco indicated was disputed, was incurred September 23, 2003 and secured by "Mortgages, UCCs, etc." on "various" properties with a total value of $6 million. A second secured creditor, National Recovery Limited Partnership ("<u>NRLP</u>") was identified as having a disputed claim of $810,000 incurred on the same date on "various" properties with a total value of $6 million. Schedule D to the Haddon petition listed Hudson's claim as disputed, in the amount of $2,975,000 on account of "Forbearance Agreement" relating to "Extension of Loan and Credit Terms. Lien on all assets." NRLP was listed as having a disputed claim of $750,000. The same disputed amounts were listed in Schedule D to the Sarah petition on account of "9/03 Loan Extension".

Exhibit A to Nancy Cook's Rule 1007-2 affidavit listed the "Largest Known Unsecured Creditors As of March 31, 2004" as the following:

| | |
|---|---|
| MCM Works, Inc. | $ 22,460.00 |
| John Cook family Trust | $ 75,200.00 |
| James Wetzel | $ 44,710.00 |
| Joan Boehm | $ 82,000.00 |
| **D.P. Boehm** | **$114,000.00** |

---

[3]    This staggering figure requires the Court to comment that the affidavit has been correctly transcribed. Ms. Cook's affidavit really does indicate that the Debtors expended the value of the *Robust* 15 times over in efforts to renovate it.

(emphasis added).

Exhibit F to Nancy Cook's Rule 1007-2 affidavit listed the following "Senior Management": "Nancy Cook, President has been Officer for 2 years" and  "Donald P Boehm Director, [Haddon] & [Sarah] for 7 years".

On April 5, 2004, an amended petition was filed in the Balco case by Ronald Cohen, amending the name of Balco's president in the petition to "Nancy Cook."  (ECF Docket No. 3) Ronald Cohen signed the amended petition.

The Debtors' cases were procedurally consolidated by order dated April 8, 2004. (ECF Docket No. 14)  Although Donald Boehm was identified as an unsecured creditor in Nancy Cook's affidavit, he was not listed in the first Schedule F filed on April 20, 2004 as part of each of the Debtors' Chapter 11 petitions.

Thereafter, on May 3, 2004, amended petitions were filed for each of the Debtors (ECF Docket Nos. 59 (in the Balco case), 11 (in the Haddon case), and 11 (in the Sarah case)).  It appears that for each Debtor an amended petition and full set of schedules and financial affairs was filed as one document, and then certain separate amended schedules, which appear to be duplicates, were filed for each Debtor simultaneously, all in the Balco case (*See* (ECF Docket Nos. 60, 61, 62, 63, 64, 65, 66, 67 and 68).  Nancy Cook signed the Balco petition as president and the Haddon and Sarah petitions as director; Mr. Cohen signed the Balco petition as Debtors' counsel, and Mr. Wulfman signed the Haddon and Sarah petitions.  The following new information appeared in the amended petitions and schedules:

–  A post office box in Newburgh, New York, was listed as the new mailing address for each of the Debtors.  The address listed for Donald Boehm on each Schedule F is the same Newburgh post office box.[4]

---

[4]    The same street address (120 Quassaick Avenue in New Windsor, New York) and post-office box address were listed for Donald Boehm in his personal bankruptcy filing. *See* Chapter 7 Case No. 05-35105, ECF Docket No. 1.

   –   The third amended petition in the Balco case listed the "Cook Family Trust" as holding a $277,000 unsecured claim.

   –   Haddon's amended Schedule F listed a $2.4 million unsecured claim in favor of Donald P. Boehm.  Eight other claims ranging in value between $65.40 and $44,700 were marked "disputed".  The only other undisputed claim in Haddon's Schedule F was for the "Warmers Family Trust c/o Antonina Campbell" in the amount of $1,266,080.00.  Amended Schedule H listed the following co-debtors: Balco, the Cook Family Trust, Donald Boehm, Joan Boehm and Sarah.

   –   Sarah's amended Schedule F listed a $1.8 million unsecured claim in favor of Donald P. Boehm; only five other secured claims were listed in Sarah's Schedule F – all disputed and the largest for $10,507.96.  Amended Schedule H listed Balco, the Cook Family Trust, Donald Boehm, Haddon and Joan Boehm as co-debtors.

On May 4, 2004, a two-page document captioned "Delete the following creditors" was filed concerning the Balco case. (ECF Docket No. 69)  On May 7, 2004, a second document captioned "Delete the following creditors" was filed by Ronald Cohen concerning the Balco case. (ECF Docket No. 80)  The second document purported to delete Donald Boehm as a creditor of Balco, although Boehm was never listed as a creditor in the schedules filed in the Balco case.  On May 27, 2004, a document captioned "Delete the following creditor," referring to Donald Boehm, was filed by Ronald Cohen in the Haddon and Sarah cases (in each case, ECF Docket No. 12).

Proofs of Claim have been filed by the following parties:

   –   Donald Boehm filed unsecured claims in each case on August 20, 2004, for "money loaned".  Boehm filed a claim for $128,908 against Balco, $2,400,000 against Haddon, and $1,800,000 against Sarah.

   –   The Cook Family Trust filed an unsecured claim of $277,000 for "money loaned" in the Balco Case.

   –   The Frederic Warmers Estate filed secured claims for $1,420,000 and $1,266,079.50 in the Balco Case.

B.    **Chapter 11 Activity**

1.    **The Financing Motion**

On April 13, 2004 the Debtors filed an "Emergency Motion for (A) Interim and Final

Orders, Under 11 U.S.C. §105, 361, 362, and 364, Approving Postpetition Financing and Related

Relief" (ECF Docket No. 29;  hereafter, the "Financing Motion").  The Financing Motion sought

approval of a $250,000 revolving credit agreement from a proposed lender identified as Total

Leasing, Inc.  On April 14, 2004 (ECF Docket No. 36), the Court authorized the Debtors to

borrow $25,000 on an interim basis, the amount necessary to meet payroll and maintain

insurance coverage on the *Robust*; the interim amount was increased to $32,700 by order dated

May 6, 2004 (ECF Docket No. 75).  On May 5, 2004, supplemental affidavits in support of the

Financing Motion were submitted by Andrew Wulfman and by Donald Boehm. (ECF Docket

No. 70)  Boehm submitted a 13-page affidavit and various exhibits, identifying himself as the

officer of Balco and the Director of Haddon and Sarah.  On May 12, 2004, Hudson and Epic

Orange filed opposition to the Financing Motion. (ECF Docket Nos. 82 and 83, respectively)  A

further hearing to consider post-petition financing was held on May 13, 2004 and concluded with

Hudson's agreement to advance $13,700 in order to cover the current payroll.

2.    **The Lift-Stay Motion Regarding *Dauntless* and *Robust***

Hudson filed a motion for relief from the automatic stay on April 28, 2004 (ECF Docket

No. 51; hereafter, the "Lift-Stay Motion").  Hudson claimed it was owed $3 million by the

Debtors in connection with several loans, and that the collateral was secured by mortgages on the

*Robust*, the *Dauntless*, the New Windsor Property, as well as Donald Boehm's personal

residence.  Hudson also alleged that in September 2003, after Haddon and Sarah defaulted under

the loans, Haddon, Sarah, Balco, Donald Boehm, Joan Boehm and Boehm Marine Transport,

Inc. entered into a Forbearance Agreement with Hudson pursuant to which Hudson agreed to forbear from pursuing its remedies under the various loans through March 31, 2004. The Forbearance Agreement (annexed as Exhibit N to the Lift-Stay Motion) was signed by Nancy Cook and Donald Boehm. The expiration of the Forbearance Agreement precipitated the Debtors' March 31, 2004 bankruptcy filing.

Notwithstanding the fact that objections to the Lift-Stay Motion were required to be filed by May 13, 2004, the Debtors did not formally oppose the Lift-Stay Motion until May 17, 2004, the day before the scheduled hearing date on the Lift-Stay Motion. (ECF Docket No. 92) The Debtor's opposition took the form of a 21-page affidavit signed by Donald Boehm.

The Court presided over lengthy evidentiary hearings on May 18, 2004 and May 28, 2004. The Debtors' principal witness as these hearings was Donald Boehm. At the conclusion of the hearings, the Court determined that cause existed to lift the stay under 11 U.S.C. § 362(d)(1), primarily due to (i) Debtors' failure to offer Hudson any adequate protection, combined with (ii) Debtors' lack of any means of paying for the constant maintenance required to sustain seagoing vessels, including provision of a crew and the supplies necessary for their sustenance, together with (iii) the lack of any evidence, beyond speculation and conjecture, of a reorganization in prospect. *See In re Balco Equities Ltd.*, 312 B.R. 734 (Bankr. S.D.N.Y. 2004). An order lifting the automatic stay was entered on June 2, 2004. (ECF Docket No. 117)

### 3.    <u>Donald Boehm's Contempt and Non-Compliance</u>

Hudson also sought and obtained a discovery order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure on April 28, 2004. (ECF Docket No. 52) The Rule 2004 order authorized issuance of a subpoena for the deposition of Donald Boehm. The Rule 2004 examination was rescheduled twice due to Boehm's failure to appear. Boehm also failed to

appear at the meeting of creditors pursuant to 11 U.S.C. § 341(a), in spite of the United States Trustee's specific request that he attend the examination.

On June 8, 2004, Hudson filed a motion for contempt (ECF Docket Nos. 119, 120, 121) against Boehm for removing certain items from the *Dauntless*, including two small boats (called dories), tools, manuals, deck furniture, "various pieces of artwork", and charts and blueprints from the pilothouse, all in violation of this Court's restraining order dated May 27, 2004 (ECF Docket No. 114). By order dated August 6, 2004 (ECF Docket No. 178), this Court held Boehm in contempt of the May 27, 2004 restraining order. On August 11, 2004 (ECF Docket No. 183) Hudson made a further motion for contempt based on Boehm's removal of items from the *Dauntless* and refusal to return them in spite of the contempt order and restraining order. On September 3, 2004 (ECF Docket No. 205) this Court issued an order holding Boehm in contempt of the August 6, 2004 order and assessing a $1,000 per day *per diem* fine against Boehm until he purged his contempt. A further contempt order against Boehm was issued by this Court on September 21, 2004 (ECF Docket No. 210). It is not clear whether Boehm ever fully purged his contempt, and this is an issue that is currently being litigated in an adversary proceeding commenced by Hudson objecting to Boehm's discharge (*See Hudson United Bank v. Boehm*, Adv. Proc. No. 05-9106) in Boehm's personal bankruptcy case, initially filed in this Court as a Chapter 11 case on January 17, 2005 (under Case No. 05-35105) and subsequently converted to Chapter 7 on April 19, 2005.

    **4.**    **Efforts to Reject Epic Orange Contract**
            **And Sell the New Windsor Property** [5]

Pursuant to a pre-petition contract dated April 17, 2003, the Debtor agreed to sell the New Windsor Property to Epic Orange for $1.1 million (with a possible price adjustment if Epic Orange received approval to build more than 110 units on the property; in that case, the purchase price would have been the number of units multiplied by $10,000). The Epic Orange Contract was negotiated pre-petition by Cohen Estis on behalf of Balco.

From the very outset of this case, the Debtors indicated that the Epic Orange contract would be rejected so that the New Windsor Property could be sold to a higher bidder. The first contract from a purported higher bidder, originally represented in an affidavit by Boehm to be an "initial contract offer" to purchase the New Windsor Property "for cash at closing of $1.6 million, without contingencies with a proposed closing date within 90 days" (*see* "Affidavit of Donald Boehm in Opposition to HUB's Motion for Stay Relief"; ECF Docket No. 92, ¶ 46) was later revealed to be a mere option contract, unsigned, and containing many contingencies, including a contingency that the buyer's proposed development project be approved by the town of New Windsor and could be supported by the existing water system. (*See In re Balco Equities Ltd.*, 312 B.R. at 744).

The Debtor did not immediately seek to reject the Epic Orange Contract. Epic Orange eventually moved to dismiss the Debtor's case and attached evidence that the proposed purchaser referred to by Donald Boehm, Golden Triangle Developers LLC, was an entity formed by the Cohen Estis firm, and a corporation search revealed that "Ronald Jay Cohen," having the same address as the Cohen Estis firm, was designated as the person to receive process from the NYS Department of State. *See* June 7, 2004 Motion by Epic Orange "seeking entry of an order

---

[5]      The background information from this section was taken from *In re Balco Equities Ltd.*, 323 B.R. 85 (Bankr. S.D.N.Y. 2005).

denying the rejection of the Epic Orange, LLC contract dismissing the case as being filed in bad

faith, converting the proceeding to a Chapter 7 and having a trustee appointed, and for such other

and further relief as the Court deems appropriate" (ECF Docket No. 118, page 33).  At a hearing

on June 15, 2004, the Court denied Epic Orange's motion to dismiss the case, but set June 30,

2004 as the deadline by which the Debtors would be required to file a motion seeking to reject

the Epic Orange Contract, with failure to timely seek rejection resulting in the Epic Orange

Contract being "deemed assumed".[6]  The Debtor filed the rejection motion on July 1, 2004 (ECF

Docket No. 141), one day later than provided in the order, resulting in further delay and leading

to litigation in the form of Epic Orange's objection to the rejection motion being filed in

disregard of the Court's deadline (ECF Docket No. 144) and Debtor's motion dated July 14,

2004 "To Extend Time to File Motion to Reject Executory Contract Nunc Pro Tunc" (ECF

Docket No. 153; *see also* ECF Docket No. 160), which was opposed by Epic Orange (ECF

Docket No. 159).  The Court finally granted the Debtor's motion, on the grounds of excusable

neglect by the Cohen Estis firm, by order dated August 10, 2004 (ECF Docket No. 181).

The Debtor's motion to reject the New Windsor Property attached a contract of sale dated

June 14, 2004, with an individual known as Aric Valdman, for $1,450,000. (ECF Docket No.

141, Exhibit B).  By order dated November 23, 2004 (ECF Docket No. 239), the Court denied

Debtors' motion, without prejudice, after Valdman repeatedly failed to appear in Court or to

disclose financial information.

Upon conversion of the case to Chapter 7 (discussed below), the Chapter 7 Trustee

renewed the Debtor's motion to reject the Epic Orange Contract in favor of a sale of the New

Windsor Property to an entity known as Upstate Properties, L.L.C. for $1.5 million in cash.  By

---

[6]     After the Court's oral ruling on June 15, 2004, an order was settled by Epic Orange on June 22, 2004, for
signature June 29, 2004.

separate orders dated March 15, 2005, the Court granted the Chapter 7 Trustee's motion to reject the Epic Orange Contract and authorized the sale of the New Windsor Property to Upstate Properties, L.L.C. (ECF Docket Nos. 298 and 300, respectively; *see also In re Balco Equities Ltd.*, 323 B.R. 85 (Bankr. S.D.N.Y. 2005)).

The sale of the New Windsor Property was completed, and the Chapter 7 Trustee is currently holding the proceeds.  Hudson and the Frederic Warmers Estate have asserted mortgages against the proceeds from the New Windsor Property, and if valid, those mortgages attach to the proceeds of sale.  The Chapter 7 Trustee commenced an adversary proceeding against the Frederic Warmers Estate, seeking to avoid its mortgage against the New Windsor Property pursuant to 11 U.S.C. § 544(a)(3)[7] and objecting to the Frederic Warmers Estate's proof of claim. (Adv. Proc. No. 05-9005; hereafter, the "Warmers Adversary Proceeding").  One of the claims made by the Frederic Warmers Estate in the Warmers Adversary Proceeding is that the New Windsor Property was transferred to Balco by Donald Boehm for nominal consideration and without permission while Boehm was the executor of the Frederic Warmers Estate.  Hudson has intervened in the Warmers Adversary Proceeding, and the litigation is ongoing. *See* the Court's March 29, 2006 Memorandum Decision Denying Motions for Summary Judgment and Limiting Issues at Trial (Adv. Proc. No. 05-9005, ECF Docket No. 56).  Until the Warmers Adversary Proceeding is resolved, it is not clear that the rejection of the Epic Orange Contract and subsequent sale will yield any benefit to unsecured creditors of the Debtors' estates.

---

[7]     Under Section 544(a)(3), a bankruptcy trustee takes, as of the commencement of the case, the rights and powers of a bona fide purchaser of real property from the debtor.

5.        **United States Trustee's Motion to Convert to Chapter 7**

On November 19, 2004, the United States Trustee moved to convert the Debtors' cases to

Chapter 7 (ECF Docket No. 235).  A hearing on the motion was scheduled for December 14,

2004.  The United States Trustee's motion required responses to be filed not later than three

business days prior to the motion.  Notwithstanding, the Debtors filed opposition to the motion

on December 13, 2004, the evening before the hearing (ECF Docket No. 242).  As the Court

noted then, the Debtors' late-filed opposition was another example of chronic tardiness and

"reorganization by ambush" tactics utilized by Cohen Estis, beginning with the haphazard,

multiple revisions of pleadings; the lack of preparation in defending the Lift-Stay Motion[8]; and

the delay in prosecuting the motions to reject the Epic Orange Contract.  The Court expressed

frustration with the conduct of the Debtors, Mr. Boehm and Mr. Wulfman, in virtually every

hearing in this case.

By order dated December 14, 2004 (ECF Docket No. 248), the Court converted the

Debtors' cases to Chapter 7, for cause, citing a failure to timely file operating reports, the

absence of a reasonable likelihood of reorganization, and delay prejudicial to creditors.  Paul

Banner was appointed as the Chapter 7 Trustee of the Debtors' estates.

---

[8]        *See, e.g.,* one of this Court's remarks in *In re Balco Equities Ltd.*, 312 B.R. at 754:

A good deal of the Debtors' conduct during the course of this case has been regrettable. After 60
days in Chapter 11 the estate was in disarray, and the Debtors squandered many opportunities
afforded them by this Court and by other parties in interest. For example, the Lift-Stay motion was
adjourned numerous times, and each time the Court expressed its concerns to the Debtors; yet the
Debtors were no better organized at the conclusion of the evidentiary hearing on May 28, 2004
than they were at the very first hearing on the motion.

II.     **Cohen Estis's Representation of the Debtors**

A.      **Retention Application**

The application to retain Cohen Estis was filed on April 8, 2004 (ECF Docket No. 10)

and signed by Nancy Cook as President of Balco.  The retention application included the

"Affidavit of Ronald J. Cohen in Support of Application to Employ and Retain Cohen, Estis &

Associates, LLP as Counsel for Debtor and Debtor In Possession".  Ronald Cohen's affidavit,

submitted "to provide the disclosures required under section 329 of chapter 11 of title 11 of the

United States Code …, the rules of this Court, and Rules 2014(a) and 2016(b) of the Federal

Rules of Bankruptcy Procedure" stated the following:

> 3. [Cohen Estis] utilizes a number of procedures (the "Firm Procedures") to determine its relationships, if any, to parties that may have connections to a client debtor. In implementing such Firm Procedures, the following actions were taken to identify parties that may have connections to the Debtors and [Cohen Estis's] relationship with such parties:
>
> > a)  [Cohen Estis] requested and obtained from the Debtors a list of interested parties and significant creditors (the "Potential Parties-In-Interest"), which has been revised and supplemented from time-to-time. The Potential Parties-In-Interest include equityholders, officers, directors and major trade creditors.
> >
> > **b)  [Cohen Estis] compared each of the Potential Parties-In-Interest to the names in its master database of current and former clients (the "Client Database"). The Client Database generally includes the name of each client, the name of the parties that are or were adverse to such client with regard to the subject of [Cohen Estis]'s retention, and the names of the [Cohen Estis] personnel who are or were primarily responsible for matters for such clients.**
> >
> > **c)  A conflicts check was issued and an investigation performed to determine whether there were any connections between [Cohen Estis] and any of the Potential Parties-in-Interest as such connection may relate to the Debtors.**
> >
> > **d)  Known connections between [Cohen Estis] and Potential Parties-In-Interest were compiled for purposes of preparing this Affidavit.**
>
> 4. As a result of the foregoing procedures, **I have ascertained that, upon information and belief, [Cohen Estis] has no connections with the Debtors and the Potential Parties-In-Interest** except as follows:

a)   Because of its broad-based general practice, [Cohen Estis] has appeared in the past and may appear in the future in cases unrelated to this chapter 11 case where one or more of the Potential Parties-In-Interest may be involved

b)   Prior to the Petition Date, [Cohen Estis] represented certain of the Debtors with respect to providing counsel for certain transactions, and has also provided general restructuring advice and provided legal counsel with respect to organizing and preparing for the filing of these cases.

c)   **[Cohen Estis] has not represented any Potential Parties-In-Interest.**

d)   Certain members of [Cohen Estis] and certain associates of and "of counsel" attorneys to [Cohen Estis], and certain of such persons' relatives may have familial or personal relationships with officers, directors and/or shareholders of creditors of the Debtors, competitors of the Debtors and/or other parties in interest in these cases. As of the date hereof, [Cohen Estis] is not aware of any such relationships.

e)   Certain members of [Cohen Estis] and certain of the associates of and "of counsel" attorneys to [Cohen Estis], and certain of such persons' relatives, may directly or indirectly be shareholders of creditors of the Debtors, competitors of the Debtors and/or other parties in interest. As of the date hereof, [Cohen Estis] is not aware of any such relationships.

f)   Certain members of [Cohen Estis] and certain of the associates and "of counsel" attorneys to [Cohen Estis], and certain of their relatives, may have business, contractual, economic, familial or personal relationships with creditors of the Debtors and/or other parties in interest or such entities' respective officers, directors or shareholders. As of the date hereof, [Cohen Estis] is not aware of any such relationships.

5. I believe that none of the representations or relationships recited above would give rise to a finding that [Cohen Estis] represents or holds an interest adverse to the Debtors with respect to the services for which [Cohen Estis] would be retained.

6. Prior to the Petition Date, [Cohen Estis] provided legal counsel to certain of the Debtors with respect to certain business transactions in the ordinary course of their business. In addition, the Debtors engaged [Cohen Estis] to assist and provide legal counsel with respect to the interests of certain creditors and, ultimately, the commencement and prosecution of these chapter 11 cases. Accordingly, [Cohen Estis] is familiar with the Debtors' business and affairs.

7. **Neither I, [Cohen Estis], nor any member, counsel or associate of the Firm represent any entities other than the Debtors in connection with the Debtors' chapter 11 cases.** In addition, except as set forth herein, to the best of my knowledge, after due inquiry **neither I, [Cohen Estis], nor any member or counsel, or associate of the Firm represent any party in interest other than the Debtors in these chapter 11 cases.**

8. **[Cohen Estis] is a "disinterested person," as that term is defined in section 101(14) of the Bankruptcy Code**, as modified by Section 1107(b) of the Bankruptcy Code, in that [Cohen Estis], its members, counsel, and associates:

a) are not creditors, equity security holders or insiders of the Debtors; and

b) are not and were not, investment bankers for any outstanding security of the Debtors.

c) have not been within the past three years investment bankers, or attorneys for investment bankers in connection with the offer, sale or issuance of a secureity [sic] of the Debtors.

d) are not and were not, within two years before the date of this affidavit, a director, officer, or employee of the Debtors or of an investment banker specified in "(b)" or "(c)".

e) **do not have an interst [sic] materially adverse to the interest of the estate or of any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interst [sic] in, the debtor** or an investment banker specified in "(b)" or "(c)".

(emphasis added).

In reliance upon Cohen Estis's retention application and supporting affidavit, the Court retained Cohen Estis by order dated April 9, 2004 (ECF Docket No. 16). The retention order stated that Cohen Estis "shall be compensated in accordance with the Affidavit, annexed to the Application, subject to sections 330 and 331 of the Bankruptcy Code, such Federal Rules of Bankruptcy Procedure as may be applicable from time-to-time, the rules of this Court and such procedures as may be fixed by order of this Court" and that Cohen Estis "shall provide such additional disclosure as is necessary or appropriate."

Although Cohen Estis was relieved as counsel by stipulation dated March 3, 2005 (ECF Docket No. 295), Cohen Estis did not file a final fee application until November 14, 2005, after the Chapter 7 Trustee had commenced an adversary proceeding to recover the Retainer.

**B.**     **Subsequent Rule 2014 Disclosures**

In Ronald Cohen's Supplemental Rule 2014 Affidavit dated July 29, 2004 (ECF Docket

No. 171), Mr. Cohen disclosed that he provided tax consulting services to Aric Valdman, the

proposed post-petition purchaser of the New Windsor Property, when Mr. Cohen was a partner at

Jacobowitz and Gubits, LLP, the firm representing Epic Orange.

Ronald Cohen's "Second Supplemental Affidavit" (ECF Docket No. 241) was filed

December 8, 2004, less than a week before the Debtors' cases converted to Chapter 7.   The

Second Supplemental Affidavit was the first time that Cohen Estis acknowledged a connection

with Donald Boehm, the Frederic Warmers Estate, and other parties in interest.   The Second

Supplemental Affidavit revealed the following information concerning Cohen Estis's

connections with Boehm and the Frederic Warmers Estate:

–   Cohen Estis was retained to represent the Frederic Warmers Estate on March
    23, 2003, while Donald Boehm was Executor of the Frederic Warmers Estate,
    "for the specific purpose of securing the pertinent information relating to the
    prior administration of the Warmers Estate and facilitating the submission of
    an accounting with respect to such periods." Second Supplemental Affidavit,
    ¶9.

–   Cohen Estis's representation of the Frederic Warmers Estate ended when
    Boehm was removed as executor in October 2003.  *Id.* at ¶12.

–   After Boehm was removed as executor, Cohen Estis "continued to provide
    services in connection with the submission of a 'final' accounting with respect
    to the prior administration of the Warmers Estate" (i.e., by Donald Boehm).
    *Id*. at ¶13.  Cohen Estis filed an amended final accounting with the
    Surrogate's Court on March 8, 2004.

–   Subsequent to the commencement of these bankruptcy cases, Cohen Estis
    continued to "provide additional legal services supplemental to the submission
    of the Accounting, in proceedings before the Surrogate's Court." *Id.* at ¶14.
    As of the date of the Second Supplemental Affidavit, "[t]hose proceedings
    remain outstanding." *Id.*

–   Cohen Estis "applied to the Surrogate's Court for an [sic] reimbursement of
    counsel fees incurred on behalf of the Warmers Estate." *Id.* at 16.  According
    to the Second Supplemental Affidavit: "As of August 11, 2004, the fees and
    expenses sought to be awarded to [Cohen Estis] total approximately
    $28,000.00." *Id.*

– Cohen Estis explained that although the Frederic Warmers Estate had been
scheduled as a creditor of Haddon in May 2004, "at that time the significance
of that information for the purposes of compliance with the disclosure
requirements of 2014 at that time was not recognized." *Id.* at 19.

The Chapter 7 Trustee has further alleged that: "Cohen Estis appeared in Surrogate's Court

proceedings respecting the Warmers Estate on June 19, 2003, July 24, 2003, September 12,

2003, November 6, 2003, December 11, 2003, February 5, 2004, and March 8, 2004, in response

to allegations of Boehm's breach of fiduciary duties and attempts to obtain an accounting

instituted by certain beneficiaries of the Warmers Estate." (ECF Docket No. 320, ¶2(b))

Cohen Estis also revealed that it represented "certain third parties who are 'parties-in-

interest' or 'related' to parties in interest," but, in Cohen Estis's view, the representation was "in

connection with certain transactions and/or legal proceedings which are completely unrelated to

these bankruptcy proceedings." (ECF Docket No. 241 at ¶24 (emphasis in original)).  Cohen

Estis identified the following:

– "Representation of the Tessie Warmers Trust in connection with the sale
of certain real estate holdings". (ECF Docket No. 241, ¶24(a))  In a
footnote to the disclosure, Cohen Estis added: "[Cohen Estis] served as
counsel to the Tessie Warmers Trust in connection with the sale by the
Trust of certain commercial real estate located in Manhassat [sic], Long
Island.  This engagement commenced on or about January 20, 2004 and
concluded on or about April 30, 2004.  Throughout [Cohen Estis's]
representation of the Trust, Mr. Boehm served as trustee thereof.  To the
best of my knowledge, the Tessi [sic] Warmers Trust holds no claim
adverse to the Debtors' bankruptcy estates."

– "Representation of, LMAD, Inc., (General Partner of Senlar Associates,
NY General Partnership), Connelly Industries, Inc., and Donald Boehm,
individually, in the case *DeBrizzi et al. vs. Senlar Associates, et als.,* Index
No. 5854/99, State Of New York Supreme Court, Orange County." *Id.* at
¶24(b).  Cohen Estis added the following footnote to the disclosure: "This
action was commenced in or about 1999.  [Cohen Estis] first became
involved in the action in or about November, 2003, substituting in as
counsel for the defendants after final judgment had been entered in that
matter.  [Cohen Estis's] representation of the defendants in that case is
continuing in connection with the enforcement of court orders and
judgments.  To the best of my knowledge, the entirety of the matters at
issue in that action are unrelated to these bankruptcy cases.  Other than

Mr. Boehm's relationship to the Debtors, I am not aware that any of the other parties to that case have any claim or interest in these bankruptcy cases." The Chapter 7 Trustee later amplified this disclosure with the following allegations:

> In addition to representing Donald Boehm in connection with the Warmers Estate, Cohen Estis also undertook (in November, 2003) the representation of Boehm and two entities he owns – LMAD, Inc. and Connelly Industries, Inc. – in proceedings in New York State Supreme Court arising out of alleged breach of fiduciary duties by Boehm in connection with the assets of Senlar Associates.

> Of particular note is a decision in the Senlar matter rendered August 22, 2003, wherein the Supreme Court justice found Boehm in contempt of court for transferring $96,000.00 to Connelly Industries, and then having Connelly transfer most of that ($88,200.00) to Haddon Holdings.

(ECF Docket No. 320, ¶2 (e) & (f))

–   Representation of Donald Boehm in proceedings to foreclose his interest in his personal residence in New Windsor, New York. (ECF Docket No. 241, ¶24(c)). Cohen Estis added that it was first consulted on the matter on March 1, 2004 but did not appear in the case or file papers until August 2004. Cohen Estis later noted in its fee application that it undertook this representation "under the rationale that this was a mortgaged asset under the Hudson United Bank reaffirmation agreement executed by the corporate debtors," and Cohen Estis believed that completion of the foreclosure would have constituted an event of default. (ECF Docket No. 314, ¶42)

## C.   Cohen Estis's Receipt of the Retainer

### *The Retention Application*

The Affidavit of Ronald Cohen, submitted with the application to employ Cohen

Estis (ECF Docket No. 10), also discussed the compensation received by Cohen Estis:

> This Affidavit is intended to comply with Federal Rule of Bankruptcy Procedure 2016(b). **[Cohen Estis] received prepetition retainer in the amount of $3,000, which it intends to apply to postpetition fees and expenses allowed by this Court. A precise disclosure of the application of the prepetition retainer and amounts held as of the Petition Date will be supplied in [Cohen Estis's] interim fee application for its postpetition services and expenses to be rendered or incurred for or on behalf of the Debtors.** No promises have been received by [Cohen Estis] or by any member or associate thereof as to compensation in connection with these cases other than in accordance with the

- 22 -

provisions of the Bankruptcy Code. [Cohen Estis] has no agreement with any other entity to share with such entity any compensation received by [Cohen Estis].

Neither I, [Cohen Estis], nor any member or associate thereof, insofar as I have been able to ascertain, represents any interest adverse to the Debtors or the Debtors' estates in the matters regarding which [Cohen Estis] is to be engaged. Except as may be stated above, I believe [Cohen Estis] is a "disinterested person" as that term is defined in section 101(14), as modified by section 1107(b), of the Bankruptcy Code.

By reason of the foregoing, I believe [Cohen Estis] is eligible for employment and retention by the Debtors pursuant to sections 327 (as modified by section 1107(b)) and 328 of the Bankruptcy Code and the applicable Bankruptcy Rules.

(emphasis added).

### *Story #1: The Engagement Letter*

The Debtors formally retained Cohen Estis by a March 31, 2004 letter agreement (the "Engagement Letter") signed by Ronald Cohen on behalf of Cohen Estis; Nancy Cook on behalf of Balco, Haddon and Sarah, and as a guarantor individually and on behalf of the Cook Family Trust; and Donald Boehm on behalf of Haddon and Sarah, and as a guarantor individually and on behalf of Connelly Industries, and "as Trustee of a certain Undisclosed Trust". In the Engagement Letter, Cohen Estis recited the following:

Since we have been authorized to commence providing services to the entities and because this matter involves three Bankruptcy filings **we require a retainer in the amount of $45,000.00**, to be paid $3,000 and (_____) today March 31, 2004 (for the filing fees @ 3 cases at $840.00 each $2,520.00 and $480.00 as a first installment towards legal fees) plus $_____ **and the balance within forty-five (45) days** by the Guarantors of the obligations set forth herein. All obligations of the Guarantors are joint and several. **We understand that one of the Guarantors, Connelly Industries, Inc. has agreed to assign to us the balance of the retainer due us (to the extent not paid by the other Guarantors) out of the proceeds it expects to receive out of a payment due it under a certain contract of sale for a certain Burger King restaurant in Nassau County, New York scheduled to close on or about April 27, 2004, which we refer to as the "Petrakis Contract".** Notwithstanding the foregoing, Donald P. Boehm, individually and as trustee of a certain undisclosed trust, Nancy M. Cook, Nancy M. Cook as the trustee of the Cook Family Trust and Connelly Industries, Inc. have agreed to jointly and severally guarantee the obligation of Cohen, Estis & Associates, LLP to remit the balance due our law office of the $45,000.00 retainer fee. If the Bankruptcy Cases are dismissed

(Voluntarily or Involuntarily) within 90 days from the date of filing March 31, 2004, it is understood that the retainer due Cohen, Estis and Associates, will be reduced to actual legal costs incurred during the time from March 24, 2004 (the approximate date that we seriously began discussing the Bankruptcy options) thru the date that the Bankruptcy case was dismissed or otherwise settled.  We point out that a decision to file the Bankruptcy Petition [sic] was not made until today and we have done everything humanly possible to file the three (3) Petitions in the fastest possible time frame.  **As we have discussed we require the retainer payment to continue to prosecute this matter as you will require.**

(emphasis added).  The Engagement Letter was first provided to the Court as Exhibit A to the

Chapter 7 Trustee's objection to the Cohen Estis fee application (ECF Docket No. 320).

### Story #2: The First Rule 2016 Statement [9]

Time records provided by Cohen Estis as part of its fee application include the following

time entry by Ronald Cohen for one hour, billed on April 25, 2004: "Discussion with Donald

Boehm as to our understanding of his concerns pertaining to the balance of the retainer fee in

light of emergencies ongoing; agreement to discuss at a leter [sic] time when things calmed

down[.]"

On May 3, 2004, Cohen Estis filed the "Disclosure of Compensation of Attorney for

Debtor(s) – Amended" filed pursuant to 11 U.S.C. § 329(a) and Bankruptcy Code Rule 2016(b)

(ECF Docket No. 59; hereafter, the "First Rule 2016 Statement").  Although designated as an

"amended" statement, it does not appear that any previous disclosure was filed by Cohen Estis in

---

[9]       Rule 2016(b) of the Federal Rules of Bankruptcy Procedure requires:

**(b) Disclosure of compensation paid or promised to attorney for debtor**

Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 15 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 15 days after any payment or agreement not previously disclosed.

these cases.  According to the First Rule 2016 Statement, which was signed by Ronald Cohen, as of the date of the statement Cohen Estis received $3,000, which was paid by the Debtor.  The First Rule 2016 Statement also indicated a "Balance Due" of $42,000 and stated that the source of compensation to be paid was "Nancy Cook, Cook Family Trust, Donald Boehm."

### *Story #3: The Second Rule 2016 Statement*

On May 11, 2004, Cohen Estis filed an amended Rule 2016 statement (ECF Docket No. 84; hereafter, the "Second Rule 2016 Statement").  The Second Rule 2016 Statement, also signed by Ronald Cohen, indicates the following:

> **DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S) - AMENDED**
> 1. Pursuant to 11 U.S.C. § 329(a) and Bankruptcy Rule 2016(b), I certify that I am the attorney for the above-named debtor and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:
>
> For legal services, I have agreed to accept $ 45,000.00
>
> Prior to the filing of this statement I have received $ 45,000.00
>
> Balance Due $ 0.00

In the Second Rule 2016 Statement Cohen Estis indicated that "[t]he source of the compensation paid to me was: . . . Donald Boehm; payment was received April 29, 2004" and that "[t]he source of compensation to be paid to me is . . . Debtor."

As of the date of this opinion, the Second Rule 2016 Statement has not been amended. As discussed below, and notwithstanding the Second Rule 2016 Statement, Cohen Estis now claims that it never received the amounts disclosed in the Second Rule 2016 Statement for services rendered or to be rendered in the bankruptcy case, and that the Retainer was merely an "internal credit".

### Story #4: The Fee Application

Cohen Estis first claimed that it never actually received the Retainer in its November 11, 2005 fee application, 18 months after filing the Second Rule 2016 Statement.  In its fee application, Cohen Estis explained:

> We represented the Tessie Warmers trust in its successful efforts to sell a parcel of underperforming improved real property, located in Hempstead, New York for the sum of $1,400,000.00.  The negotiated sales price was several hundred thousand dollars in excess of the appraised value of the property.  Under the trust agreement Donald Boehm was not a beneficiary and had no pecuniary interest.  A copy of the trust agreement is annexed as Exhibit F.  The transaction closed in late April, 2004.  The Cohen firm was paid the sum of $68,000.00 for handling this complex transaction by the Trust.  The fee earned was attributable to (a) real estate counsel services; (b) tax services, and (c) deal structuring services.  The Cohen firm had requested a fee in excess of $100,000.00 in this matter.  To the best of our knowledge the Tessie Warmers trust has no relationship of any kind to the debtor and therefore there was no duty to make any disclosure to this Court pertaining to that matter. . . . **When the emergency Bankruptcy filings became necessary, we further agreed to allow $ 42,000 of the fee on the compromised amount to be used as a retainer on the Bankruptcy**.  A reason why this was done was to assure Mr. Wulfman that he would receive appropriate credit towards his compensation for working on the Bankruptcy matters.

(ECF Docket No. 314, ¶41 (emphasis added)).  Cohen Estis did not explicitly disclose in the fee application that Donald Boehm was the Trustee of the Tessie Warmers Trust, and that it was Boehm who retained the Cohen Estis firm to represent the Tessie Warmers Trust.  Cohen Estis did not disclose, and it has never reconciled the apparently inconsistent recitation in the Engagement Letter that, "We [Cohen Estis] understand that one of the Guarantors, Connelly Industries, Inc. has agreed to assign to us [Cohen Estis] the balance of the retainer due us (to the extent not paid by the other Guarantors) out of the proceeds it expects to receive out of a payment due it under a certain contract of sale for a certain Burger King restaurant in Nassau County, New York scheduled to close on or about April 27, 2004. . . ."  Connelly Industries is a

corporation owned by Donald Boehm.  Thus, it is unclear whether the Retainer was received as a

fee from the Tessie Warmers Trust, or from Connelly Industries, or from someone else.

### The $68,500 Check

The "Supplemental Statement Submitted by Cohen, Estis and Associates, LLP" dated

March 17, 2006 (ECF Docket No. 325) attaches a copy of "the $68,500.00 check that was the

legal fee paid from the escrow we were holding on the real estate transaction to our firm on April

27, 2004."  The check is from Cohen Estis's IOLA account, Matter #8008 (later identified as

"Donald Boehm / Burger King / commercial real estate matter number 8008"[10]) and made

payable to Cohen Estis.  Cohen Estis argues: "This is clearly a pre-petition fee earned on another

matter not from the Debtor.  If the Court orders these funds returned, we will only be returning

the funds to ourselves." (ECF Docket No. 325, ¶15)  The actual transferor of the $68,500 check

to Cohen Estis is not identified.  The Court observes that the check's date (April 27, 2004),

amount ($68,500) and source of the payment (Cohen Estis) are each inconsistent with the date

(April 29, 2004), amount ($45,000) and source (Donald Boehm) identified in the Second Rule

2016 Statement.  In these circumstances, and with no other supporting evidence, the fact that

Cohen Estis wrote a check to itself from its IOLA account is virtually meaningless.

### Ronald Cohen's Rule 2004 Testimony [11]

In Cohen Estis's "Supplemental Statement," Mr. Cohen urged: "At the very least, I ask

the Court to read the deposition transcripts from the Rule 2004 examinations conducted by the

Chapter 7 Trustee and Hudson United Bank.  I testified for over two (2) hours in those

examinations and more fully explained the behind-the-scenes work that our firm was doing."

(ECF Docket No. 325)  The Court has reviewed the excerpts of the Rule 2004 examination

---

[10]     ECF Docket No. 328, Ex. A, p. 75.

[11]     Fed. R. Bankr. P. 2004

provided by Cohen Estis in a further pleading submitted by Cohen Estis on March 31, 2006

(ECF Docket No. 328, Ex. A).  In the Rule 2004 examination, conducted January 6, 2006, Mr.

Cohen provided the following elaboration concerning the $68,500 check from Cohen Estis's

IOLA account:

> Q. [Unidentified]: Do I understand it that the funds that were applied to the fee for the bankruptcy case are fees that you earned in connection with the sale of this Burger King property?
>
> MR. COHEN: My fee for handling the Burger King transaction was $68,500.00. That was my fee.  That money was paid to me.  Donald Boehm indicated to me that he had a financial problem and what I agreed to do was to credit as against the bankruptcy case the sum of $42,000.00 in a totally independent credit transaction.
>
> Q: Was there ever any understanding with Mr. Boehm that at some point in the future you would be paid in full for the work that you did on the sale of the Burger King property?
>
> MR. COHEN: I was paid in full for the Burger King property.
>
> Q: But it appears that if you credit $42,000.00 of that to work in the bankruptcy case, somebody is still owed money.  It appears the firm would still be owed money for work that was done.
>
> MR. WEISZ (counsel to Cohen Estis): Objection.  Assumes facts not in evidence but I think the balance of the Affidavit talked about Mr. Wulfman's – that is really the issue here.  Why don't you explain that issue.
>
> MR. COHEN: I will explain what happened.  Donald Boehm was in severe financial difficulty.  He was originally supposed to pay $50,000.00 if we were going to do a bankruptcy.  He negotiated that fee down from 50 to 45,000.  He was originally supposed to pay $110,000.00 in the Burger King transaction as Trustee of the Trust.  He negotiated that down.  I agreed to accept the [$68,500] as a reduction of my fee in that transaction.  Because he had a major financial problem and because I was optimistic that we would be able to put a restructuring plan together dealing with these millions of dollars of assets, I felt that question would be successful and that we would put a fee application in at the conclusion of the bankruptcy case and we would be paid.  I needed Mr. Wulfman to work on the bankruptcy case because he was the only bankruptcy attorney in the office.  I wasn't well at that point in time and Mr. Wulfman had a financial relationship with our office that part of his salary was a bonus arrangement based upon cash collections and productivity.  So, in order to get Mr. Wulfman to work on the Balco bankruptcy case, I had to do an internal credit in our accounting system in the office because Boehm didn't have the capacity to pay the $42,000.00 but what I agreed to do between Mr. Wulfman and Mr. Boehm is I agreed to credit out $42,000.00, which I did.  I applied it to Mr. Wulfman's quote internal account

with our office so he would get credit for $42,000.00 of legal work and when we
submitted the fee application, obviously, we took a credit against our full fee that
we had hoped to receive to the extent of that $42,000.00.  That is what took place.

(ECF Docket No. 325, Ex. A, p. 77-80)  The Rule 2004 testimony quoted above does not reflect

whether the $68,500 fee was paid to Cohen Estis by Donald Boehm, Connelly Industries, the

Tessie Warmers Trust, or some other person or entity.

The Tessie Warmers Trust and its beneficiaries have sought permission to intervene in

this adversary proceeding,[12] claiming that it should receive the Retainer disgorged from Cohen

Estis.  The Tessie Warmers Trust alleges:

> As background, prior to April 27, 2004, the Trust owned property located
> at 500 Fulton Avenue, Hempstead, New York which was leased by a Burger King
> and generating substantial income for the Trust beneficiaries. On April 27, 2004,
> Donald Boehm, as Trustee of the Trust, sold the Hempstead property without the
> knowledge or consent of the beneficiaries. Mr. Boehm apparently retained Cohen
> to represent the Trust in this matter. However, even though Cohen was aware of
> Donald Boehm's fiduciary duties as Trustee of the Trust, he assisted in
> negotiating a contract whereby Boehm would personally benefit as a "leasing
> agent" and Boehm's alter-ego, Connelly Industries, would receive substantial
> sums of money as a "third party vendor."

> Cohen charged the Trust the sum of $68,500.00 in alleged legal fees for
> this fairly standard commercial real estate transaction. However, from a review of
> the documents filed by Cohen, it appears that the legal fees charged to the Trust
> may have been inflated so that Donald Boehm and his related entities would have
> sufficient cash to fund the retainer for his bankruptcy filings. This breach of
> fiduciary duty and diversion of assets by Cohen is being pursued by the Trust
> in State Court proceedings. In any event, it appears by all of the admissions that
> the $42,000.00 retainer fee never belonged to the Debtors and is not now part of
> the bankruptcy estate.

(Adv. Proc. No. 05-9045, ECF Docket No. 9)

---

[12]     The Motion to Intervene has been adjourned from time to time and is currently returnable July 25, 2006.

D.     **The Adversary Proceeding**

On August 30, 2005, the Chapter 7 Trustee filed a complaint (Adv. Proc. No. 05-9045; ECF Docket No. 1), captioned as a "Complaint to Recover Money".  The Chapter 7 Trustee demanded that Cohen Estis account for and disgorge the Retainer for (1) failure to disclose connections with Boehm and the Frederic Warmers Estate until December 8, 2004, when the Second Supplemental Affidavit was filed, and (2) failure to apply to the Court for allowance of fees as required by the terms of the retention order and Bankruptcy Code Section 330.

Cohen Estis filed an answer on September 16, 2005 (ECF Docket No. 4).  Cohen Estis admitted that no fee application had ever been filed. *Id.*, ¶20.  Cohen Estis claimed that it disclosed connections to Boehm and the Frederic Warmers Estate in paragraphs 4(a) and 5 of the April 7, 2004 affidavit of Ronald Cohen.  In the paragraphs Cohen Estis relies upon, Ronald Cohen stated:

> 4. As a result of the foregoing procedures, I have ascertained that, upon information and belief, [Cohen Estis] has no connections with the Debtors and the Potential Parties-In-Interest except as follows:
>
>> (a) Because of its broad-based general practice, [Cohen Estis] has appeared in the past and may appear in the future in cases unrelated to this chapter 11 case where one or more of the Potential Parties-In-Interest may be involved
>>
>> * * *
>
> 5. I believe that none of the representations or relationships recited above would give rise to a finding that [Cohen Estis] represents or holds an interest adverse to the Debtors with respect to the services for which [Cohen Estis] would be retained.

The parties agreed that the most efficient way to resolve the adversary proceeding would be in the context of a fee application by Cohen Estis, to which the Chapter 7 Trustee and other parties in interest could object.

E.    **The Fee Application**

Cohen Estis's first and final fee application, signed by Ronald Cohen as the firm's

managing partner, was filed on November 14, 2005 (ECF Docket No. 314).  Of the total of

487.83 hours of work billed in the case by Cohen Estis, 292.55 were performed by Andrew

Wulfman.  Ronald Cohen billed the second highest total, 64.48 hours.  Mr. Cohen stated that

"Andrew Wulfman was a senior associate attorney employed by Cohen Estis and Associates,

LLP to manage the firm's bankruptcy practice," and that Mr. Wulfman "with over 15 years of

experience as an attorney was deemed by the firm to be the most qualified attorney in the office

to handle the Cohen firm's bankruptcy matters." *Id.*, ¶13.  Mr. Cohen also stated:

> There are other additional circumstances that the court needs to be aware of in
> evaluating this fee application.  First, managing partner Ronald Jay Cohen had
> been diagnosed as a diabetic in January 2004 and the diabetic condition
> throughout the Spring of 2004 resulted in severe limitations on his capacity to
> perform the full range of his customary legal services due to drastic problems
> with his vision.  Mr. Wulfman was therefore a very important attorney in the
> overall mix of the Cohen, Estis practice and heavily relied upon, particularly with
> the health issues Mr. Cohen was confronted with and the need for Mr. Wulfman
> to manage the Bankruptcy case.  By late December, 2004 the Cohen Firm and Mr.
> Wulfman had a parting of the ways.

*Id.* at ¶47.

The fee application also summarized the major projects that Cohen Estis undertook on

behalf of the Debtors during the Chapter 11 case, including "Preparation of the Bankruptcy

Petition, Emergency Filing and Information Gathering," "Emergency Business Operations,"

"Emergency Financing," "Retention of Other Professionals," "Motion to Reject Contract," and

"Efforts to Sell Assets."   As discussed above, every one of the Debtors' efforts in Chapter 11

were ultimately unsuccessful and marked by procedural errors and complications, as well as

significant substantive problems.  The largest portion of the fee application was devoted to a

description of Ronald Cohen's efforts to market the New Windsor Property.  Although the

property was ultimately sold by the Chapter 7 Trustee to Upstate Properties USA, LLC, the

buyer originally made the offer to the Debtors prior to conversion of the case (ECF Docket No.

255, Ex. A).  Cohen Estis argues:

> [Cohen Estis] believes that their substantial efforts of attempting to develop a
> sales plan for the debtors and help in selling the assets helped develop maximize
> [sic] the value of the New Windsor, New York real estate.  This property was
> ultimately sold to Upstate Properties USA, LLC, a New York State Limited
> Liability company, with an office at Lee Avenue, (Williamsburg) Brooklyn, New
> York for $1,500,000.00 with the approval of this Court, an amount in excess of
> $400,000.00 over the original Epic Orange contract price.  [Cohen Estis] used its
> numerous contacts in the Hassidic community in Williamsburg and Boro Park,
> Brooklyn, Monsey (Rockland) and Kiryas Joel (Orange County), to create a
> "buzz" pertaining to the New Windsor property.  Applicant maintains that the
> ultimate purchaser being part of this insular Hassidic community demonstrates the
> reach of the buzz created ultimately benefiting the Estate, upon the sale of the
> New Windsor, New York property for $1,500,000.00, $400,000.00 higher than
> the price set forth in the 2003 Epic Orange contract.

ECF Docket No. 314 at ¶29.

Epic Orange, the Chapter 7 Trustee and the United States Trustee filed objections to the

award of any fees and expenses to Cohen Estis (ECF Docket Nos. 319, 320 and 322,

respectively), and requested disgorgement of the Retainer.  More specifically, the U.S. Trustee

objected to the Cohen Estis fee application for failure to make appropriate and timely disclosures

pursuant to Fed. R. Bank. P. 2014(a); conflict of interest and lack of disinterest under 11 U.S.C.

§§ 328(c) 327(a) and 101(14); and to the extent the Court deems any award at all as appropriate,

excessiveness of fees sought and inadequate time records.

After initial hearing, the fee application was adjourned to allow Cohen Estis to respond to

the objections.  Cohen Estis did so in a Supplemental Statement submitted by Ronald J. Cohen

on March 20, 2006 (ECF Docket No. 325).  Mr. Cohen stated:

> I understand now that the disclosures my firm made in this case do not rise to the
> level of the disclosure expected by the Court as expressed by Judge Brozman in
> *Leslie Fay Companies, Inc.*, 175 B.R. 525 (Bkrtcy. [sic] S.D.N.Y. 1994).  I
> believe that our firm has acted in the best interests of the estate and therefore,

while a monetary sanction of some amount may be appropriate, our application
for fees and disbursement should not be denied in full.

*Id.* at ¶2.  Mr. Cohen repeated the statement that the firm relied upon Mr. Wulfman "to manage

the principal procedural aspects of the bankruptcy case" in view of Mr. Cohen's medical

condition.  Mr. Cohen stated that he "relied upon [Mr. Wulfman] as a drafter, editor and

proofreader of all Affidavits I submitted to the Court in 2004." *Id.* at ¶5.

The Court ruled on April 11, 2006 that all professional fees should be denied to Cohen

Estis due to the multiple, untimely and incomplete disclosures in violation of Bankruptcy Rules

2014(a) and 2016(b) and Cohen Estis's lack of disinterestedness pursuant to 11 U.S.C. §§ 328(c),

327(a), and 101(14).  The Court noted that, had appropriate disclosures been made when

required, the Court never would have authorized the retention of Cohen Estis as counsel for the

Debtors.  The Court also directed that the Retainer be disgorged and held by the Chapter 7

Trustee in escrow pending further order of the Court.

### F.    <u>The Reconsideration Motion</u>

Next Cohen Estis made a Motion for Reconsideration of the Court's order denying fees to

Cohen Estis and ordering disgorgement of the Retainer (ECF Docket No. 330; hereafter, the

"<u>Reconsideration Motion</u>").

The affidavit in support of the Reconsideration Motion was submitted by Deborah

Weisman-Estis, a member of the Cohen Estis firm, asking the Court to reconsider the April 11,

2006 ruling and April 26, 2006 order "on the grounds of manifest injustice".  According to time

records annexed to the fee application, Ms. Weisman-Estis worked a total of one half-hour on

these matters on a single day, November 14, 2004.

Ms. Weisman-Estis states in her Affidavit: "I am disappointed that the Court has disposed

of our Fee Application and issued an Order requiring us to turn over monies to the Chapter 7

Trustee . . . without a full evidentiary hearing.  I had planned on testifying at the hearing."  Ms. Weisman-Estis speculated that "[t]he Court apparently believes that our firm had a long relationship with Donald Boehm," and that "the Court does not appreciate the amount of time and effort expended by numerous attorneys and support staff on this matter, nor the reliance by [Cohen Estis] and its Managing Partner, Ronald J. Cohen, on Bankruptcy Counsel Andrew S. Wulfman to guide us through all aspects of this matter, including, but not limited to, the requisite disclosures of the Bankruptcy Code that are required to be made by Debtor's counsel."

On the other hand, while making Mr. Wulfman the scapegoat for Cohen Estis's disclosure deficiencies, Ms. Weisman-Estis protests that "Andrew Wulfman's time was less than 60% of the attorney time our firm spent on this matter" and that the assistance from others in the firm "was more extensive than what is indicated in the invoice submitted with the Fee Application."  Ms. Estis also argues that, "[f]or the Court to rely as the sole evidentiary proof on a certification prepared by Mr. Wulfman, and signed by Mr. Cohen when he was visually impaired, seems unfair."

According to Ms. Weisman-Estis's Affidavit, Cohen Estis has so far forwarded a check for only $513 to the Chapter 7 Trustee, notwithstanding the requirement in the Court's April 26, 2006 order that: "The balance of the $45,000.00 retainer, or the sum of $42,483.00, is directed to be disgorged by Cohen Estis and paid to Paul L. Banner, Chapter 7 Trustee herein, to be held by the Chapter 7 Trustee pending further orders of the Court to be entered in Adversary Proceeding No. 05-09045." (ECF Docket No. 329)

## DISCUSSION

**I.**   **Failure to Disclose**

Bankruptcy Code Section 327(a) provides in relevant part that: "the trustee, with the court's approval, may employ one or more attorneys, accountants, auctioneers, or other professional persons, that do no hold or represent an interest adverse to the estate, and that are disinterested persons. . . ."

A "disinterested person," as the term is defined in Bankruptcy Code Section 101(14), means a person that:

> does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor . . ., or for any other reason[.]

Rule 2014(a) of the Federal Rules of Bankruptcy Procedure sets forth the requirements for any professional that seeks to be employed pursuant to Section 327(a).  Rule 2014(a) requires:

> **(a) Application for an order of employment**
>
> An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327 . . .shall be made only on application of the trustee or committee. The application shall be filed and . . . a copy of the application shall be transmitted by the applicant to the United States trustee. The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, **to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest**, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

(emphasis added).  Failure to disclose direct or indirect relations to, connections with, or interests in the debtor violate Bankruptcy Code Section 327(a) and Bankruptcy Rule 2014.

The purpose of Rule 2014(a) is to provide the court and the United States trustee with information to determine whether the professional's employment is in the best interest of the estate… .  Rule 2014 disclosures are to be strictly construed and failure to disclose relevant connections is an independent basis for the bankruptcy court to disallow fees or to disqualify the professional from the case.

*Exco Res., Inc. v. Milbank, Tweed, Hadley & McCloy LLP (In re Enron Corp.)*, 2003 WL 223455 at *4 (S.D.N.Y. Feb. 3, 2003) (citations omitted).

All facts that may have any bearing on the disinterestedness of a professional must be disclosed. Consistent with the duty placed on the professional, it is the responsibility of the professional, not of the court, to make sure that all relevant connections have been brought to light… .  So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification.

*In re Leslie Fay Cos., supra*, 175 B.R. at 533 (citations omitted).

"At a minimum, failure to disclose is an exacerbating factor warranting the reduction or denial of fees for lack of disinterestedness. . . . Regardless of the precise application, wilful or intentional failure to disclose merits the harshest sanctions." *In re Granite Partners, L.P*, 219 B.R. 22, 41 (Bankr. S.D.N.Y. 1998) (citations omitted).

Courts have imposed a variety of sanctions based on a failure to make the required disclosures. The sanctions range from a denial of all fees, to a reduction of fees, to the imposition of economic sanctions…. If, however, the failure to disclose results in a professional being employed to perform services for which it is not eligible for retention under 11 U.S.C. § 327, denial of all fees for those services is required…. Similarly, all compensation should be denied to an attorney who willfully disregards his or her fiduciary obligations under the disclosure rules….

*In re Fretter, Inc.*, 219 B.R. 769, 776 -777 (Bankr. N.D. Ohio 1998) (citations omitted).

As set forth above, Cohen Estis does not dispute that it failed to adequately disclose its connections with parties in interest.  The failure to disclose resulted in the employment of Cohen Estis as Debtors' counsel when it was not eligible for retention.

Although this alone is sufficient to deny all fees to Cohen Estis, the Court also believes

that the failure to disclose was deliberate.  The Seventh Circuit has observed:

> Before a bankruptcy court elects to award partial payment to a law firm or other
> professional that was improperly employed, it should consider whether the
> professional's failure to disclose was intentional. If any evidence exists to support
> an inference of intent, then the court should not fall prey to the professional's
> story of confusion, miscommunication, or negligence. We believe a bankruptcy
> court should punish a willful failure to disclose the connections required by
> Fed.R.Bankr.P. 2014 as severely as an attempt to put forth a fraud upon the court.

*In re Crivello*, 134 F.3d 831, 839 (7th Cir. 1998).

In Ronald Cohen's April 7, 2004 affidavit supporting the retention of Cohen Estis as

counsel to the Debtors, Mr. Cohen describes at length the procedures used by the Cohen Estis

firm to determine "its relationships, if any, to parties that may have connections to a client

debtor." (ECF Docket No. 10, ¶3)  According to Mr. Cohen, a list of interested parties, including

equity holders, officers and directors, and significant creditors was compiled, and this list was

compared with the names in its "master database of current and former clients," which includes

the name of each client, the "name of the parties that are or were adverse to such client" and the

names of Cohen Estis personnel who are or were primarily responsible for the matters. (*Id.* at

¶3(b))  Mr. Cohen reported:

> As a result of the foregoing procedures, I have ascertained that, upon information
> and belief, [Cohen Estis] has no connections with the Debtors and the Potential
> Parties-In-Interest except as follows:
> * * *
> c) [Cohen Estis] has not represented any Potential Parties-In-Interest.

In other words, Mr. Cohen would have the Court believe that Cohen Estis's conflict search did

not reveal that the firm currently represented Donald Boehm or the Frederic Warmers Estate.  It

is impossible that Ronald Cohen was unaware of Boehm's connection with these cases,

particularly when Boehm signed the Haddon and Sarah petitions and was listed as the largest

- 37 -

known unsecured creditor.  Cohen Estis's time records reveal that Ronald Cohen was in regular

contact with Boehm.[13]  Moreover, Cohen Estis had been retained to defend Boehm against

foreclosure of his personal residence, which had been guaranteed as collateral to Hudson United

Bank in connection with loans to the Debtors.  Cohen Estis also represented Boehm personally,

along with Boehm's corporation, Connelly Industries, in state court litigation, and also handled a

real estate transaction on behalf of the Tessie Warmers Trust, of which Boehm was the Trustee.

The real estate transaction that Cohen Estis handled on behalf of the Tessie Warmers Trust also

produced revenue for Connelly Industries, according to Cohen Estis's own Engagement Letter,

and, Cohen Estis contends, generated the Retainer.

Ronald Cohen and Cohen Estis also knew that the Frederic Warmers Estate was a

creditor of the Debtors, and that Donald Boehm had been the Trustee of the Frederic Warmers

Estate.  Ronald Cohen and Cohen Estis must have also known that both before and after the

bankruptcy filing Cohen Estis was engaged in preparing an accounting on behalf of the Frederic

Warmers Estate, an entity adverse to both Boehm and the Debtors.  Thus, Cohen Estis

represented both (1) the Debtors, (2) Donald Boehm, who was the Debtors' principal and major

---

[13]    Ronald Cohen's time entries include the following:

March 30, 2004, 1.80 hours (attended conference with Donald Boehm); March 31, 2004, 4.50
hours (attended conference with Donald Boehm); April 3, 2004, 3.50 hours ("Conference with
AW, DB and NC regarding administrative work to be undertaken by the Cohen Estis firm and
outline of roles of ronald [Sic] Jay cohen [sic] and Andrew Wulfman for protection of debtor;
there would always be at least tow [sic] attorneys familiar with the matter"); April 25, 2004, 1
hour (discussion with Donald Boehm); May 24, 2004, .10 hour (continued discussion with Donald
Boehm); November 5, 2004, 2.25 hours (conference with Donald Boehm "as to multifaceted
overview of status of UPS – offer of Goldstein; Consideration of offer of Joseph Freund and desire
to stay with Valdman if he can produce because that is my word"); November 10, 2004, .50 hour
(telephone call to Donald Boehm in connection with meeting set for Thursday November 11, 2004
to review status of matters); November 14, 2004, 2.40 hours (conference at Cohen Estis with
Donald Boehm and Aric Valdman); November 16, 2004, 1.50 hours (detailed communication with
Donald Boehm and Aric Valdman); November 22, 2004, 5.50 hours (conference with Simon
Schwartz, Bernard Mittleman and Donald Boehm); November 26, 2004, .25 hour (telephone call
from Donald Boehm); November 28, 2004, 4.20 hours (Sunday conference with Donald Boehm,
Bernard Mittleman and Simon Schwartz).

creditor, and (3) The Frederic Warmers Estate, which was a major creditor.  The reality of the

situation is that entities such as the Debtors, the Frederic Warmers Estate, the Tessie Warmers

Trust, and Connelly Industries can only act through their representatives; in each case, the

representative that Cohen Estis dealt with was Donald Boehm.

Ronald Cohen's statement in his April 7, 2004 affidavit – that "neither I, [Cohen Estis],

nor any member or counsel, or associate of the Firm represent any party in interest other than the

Debtors in these chapter 11 cases" – was misleading because the retention application did not go

on to disclose Cohen Estis's representation of parties in interest outside of the chapter 11 cases.

The only affirmative disclosure that Cohen Estis points to is contained in the following

paragraphs from Ronald Cohen's April 7, 2004 affidavit:

> 4. As a result of the foregoing procedures, I have ascertained that, upon
> information and belief, [Cohen Estis] has no connections with the Debtors and the
> Potential Parties-In-Interest except as follows:
>
> > (a) Because of its broad-based general practice, [Cohen Estis] has
> > appeared in the past and may appear in the future in cases unrelated to
> > this chapter 11 case where one or more of the Potential Parties-In-
> > Interest may be involved
> >
> > * * *
>
> 5. I believe that none of the representations or relationships recited above
> would give rise to a finding that [Cohen Estis] represents or holds an interest
> adverse to the Debtors with respect to the services for which [Cohen Estis] would
> be retained.

This type of carefully crafted, say-nothing disclosure was aptly described by another court as

"coy" and insufficient because it requires the Court to "ferret out pertinent information from

other sources". *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991) (regarding disclosure of

fee arrangements).  Even the disclosure relied upon by Cohen Estis is misleading because it does

not reveal that Cohen Estis actually represented other parties in interest, and it incorrectly

concludes that such representations or relationships would not give rise to a finding that Cohen

Estis represented or held an interest adverse to the Debtors.

- 39 -

## II.   <u>Lack of Disinterestedness</u>

Bankruptcy courts have the discretion to deny allowance of compensation to a professional employed under Bankruptcy Code Section 327 "if, at any time during such professional person's employment under section 327 . . . such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed."  11 U.S.C. § 328(c).

Ronald Cohen stated in his April 7, 2004 affidavit that Cohen Estis, its members, counsel and associates: "do not have an interst [sic] materially adverse to the interest of the estate or of any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interst [sic] in, the debtor . . . ."  That statement was blatantly false, or at best misleading, because Cohen Estis also represented Donald Boehm, whose interests are directly and materially in conflict with the interests of the estate, as well as to the other creditors.  This Court stated nearly two years ago that: "[t]he obvious goal of the reorganization is not an effort to repay the few non-insider creditors but an effort to salvage the investments of Mr. Boehm and other insiders." *In re Balco Equities Ltd., Inc.*, *supra,* 312 B.R. at 753.  Thus, Cohen Estis's justification for failing to disclose its relationship with Boehm because Cohen Estis "only tried to generate a dividend for unsecured creditors" is absurd.  Cohen Estis is really arguing that its failure to disclosure its relationship with Donald Boehm should be excused because Cohen Estis "only tried to generate a dividend for [primarily, Donald Boehm]".  The Frederic Warmers Estate, which Cohen Estis represented both pre- and post-petition, is also materially adverse to the Debtors.  The Frederic Warmers Estate continues to assert that Donald Boehm, while he was the executor, wrongfully permitted the transfer of the New Windsor Property to Balco.  Cohen Estis prepared an accounting on behalf of the Warmers Estate and was reporting financial

information for the period when Boehm was executor at the same time that Cohen Estis represented these Debtors, which are Boehm's corporations.  The conflict of interest is obvious.

Even taking Cohen Estis's desire to help unsecured creditors at face value, and even if the Court credited Cohen Estis with "creating a buzz" that lead to the Chapter 7 sale of the New Windsor Property, the Court would still be compelled to deny all fees.  No matter how laudable the purported intentions, the failure to reveal such obvious and extensive connections and conflicts of interest could never be excused based upon a desire to help unsecured creditors.  On both the principle and the facts, the Court also rejects Cohen Estis's argument, essentially that the ends justify the means, and that Cohen Estis should receive some compensation for its role in the eventual sale of the New Windsor Property.  First, the Court believes that the requirements in the Bankruptcy Code and Rules pertaining to disclosure and disinterestedness do not provide for exceptions, regardless of whether the professional's services benefit the estate. *See, e.g., In re eToys, Inc.*, 331 B.R. 176, 193 (Bankr. D. Del. 2005) ("Harm to the estate is not necessary to a decision to order disgorgement of fees where there is a conflict of interest.") (quoting *In re Leslie Fay Cos., supra,* 175 B.R. at 531).  Second, as noted above, litigation over the proceeds of the New Windsor Property is ongoing, and it is not yet clear that the estate will receive any benefit from the sale.  As this Court has tried to impress throughout this decision, the Chapter 11 reorganization was disastrous and imploded into a black hole of Chapter 7 litigation.  While there is still a potential for a distribution to unsecured creditors, it is also possible that the estate could wind up administratively insolvent.  There is very little that can be said about the Chapter 11 case or subsequent Chapter 7 case in mitigation of Cohen Estis's failure to disclose its conflicts of interest.

This brings the Court to the final argument offered by Cohen Estis for why its fees should not be denied in full.  Cohen Estis lays the blame for virtually everything that went wrong in this case at the feet of its former associate, Andrew Wulfman.  Part 1200.5 [DR 1-104] of New York's Disciplinary Rules of the Code of Professional Responsibility provides:

**Responsibilities of a partner or supervisory lawyer and subordinate lawyers.**

A.  A law firm shall make reasonable efforts to ensure that all lawyers in the firm conform to the disciplinary rules.

B.  **A lawyer with management responsibility in the law firm or direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the disciplinary rules**.

C.  A law firm shall adequately supervise, as appropriate, the work of partners, associates and nonlawyers who work at the firm. The degree of supervision required is that which is reasonable under the circumstances, taking into account factors such as the experience of the person whose work is being supervised, the amount of work involved in a particular matter, and the likelihood that ethical problems might arise in the course of working on the matter.

D.  **A lawyer shall be responsible for a violation of the disciplinary rules by another lawyer or for conduct of a nonlawyer employed or retained by or associated with the lawyer that would be a violation of the Disciplinary Rules if engaged in by a lawyer if**:

1.  The lawyer orders, or directs the specific conduct, or, with knowledge of the specific conduct, ratifies it; or

2.  **The lawyer is a partner in the law firm** in which the other lawyer practices or the nonlawyer is employed, or has supervisory authority over the other lawyer or the nonlawyer, **and knows of such conduct, or in the exercise of reasonable management or supervisory authority should have known** of the conduct so that reasonable remedial action could be or could have been taken at a time when its consequences could be or could have been avoided or mitigated.

E.  A lawyer shall comply with these Disciplinary Rules notwithstanding that the lawyer acted at the direction of another person.

F.  A subordinate lawyer does not violate these Disciplinary Rules if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty.

"DR 1-104(D)(2) prevents a lawyer from attempting to lay blame upon a partner, associate or non-lawyer employee for misconduct that occurs in the lawyer's office.  This provision

recognizes that a lawyer is under a duty to know how a client's file is being handled and cannot simply claim ignorance of another's misconduct." *Heritage East-West v. Chung & Choi*, 6 Misc.3d 523, 531-532, 785 N.Y.S.2d 317, 324 (N.Y. City Civ. Ct. 2004) (quoting Connors, Practice Commentaries, McKinney's Cons. Laws of N.Y., Book 29, Professional Responsibility, DR 1-104).  In *Chung & Choi*, a landlord and its attorney were sanctioned for filing six "patently false" affidavits of investigation of non-military status in order to obtain default judgments and warrants of eviction.  Although the affidavits were prepared and sworn to by an employee of the landlord's attorney, the attorney was sanctioned for submitting the false affidavits because "the responsibility for the accuracy and truthfulness of the statements contained therein ultimately falls upon the Petitioner and the Petitioner's attorney who filed them with the court," and the attorney "knew or should have known that they were false but submitted them to the Court with either actual or imputed knowledge of their falsity in order to procure default judgments and warrants of eviction." 785 N.Y.S.2d at 324-325.  In *In re Levin*, 1998 WL 732878 (Bankr. E.D. Pa. Oct. 15, 1998), an attorney's fees were partially disgorged when it was revealed that he had not received payment as reported in the 2016(b) statement filed with the bankruptcy court.  The court noted that the attorney "sought to place blame on an associate in his office, contending that what occurred here was not representative of his practice." 1998 WL 732878 at *4, n. 2.  Nevertheless, the court in *Levin* held, as this Court does, that "the fact that it was done by him or someone working for him is irrelevant to the consequence of the conduct." *Id.*

While Mr. Cohen may have relied upon Mr. Wulfman to "manage the principal procedural aspects of the bankruptcy case," the ultimate responsibility for failure to disclose connections with parties in interest in this case rests with the partners in the Cohen Estis firm. Although Mr. Cohen has stated that Mr. Wulfman was the "drafter, editor and proofreader of all

Affidavits I submitted to the Court in 2004," Mr. Cohen does not deny that he signed the affidavits, and he does not claim that he was unaware of their contents.  Mr. Cohen was required, in his reasonable exercise of supervisory authority – not to mention his own duty as an officer of the Court – to inform himself as to the contents of any affidavit that he signed.  As illustrated in the *Chung & Choi* case, *supra*, an attorney with supervisory authority may be held responsible even for those submissions that he or she did not sign; the same principle applies even more forcefully where, as here, the supervising attorney attempts to blame a subordinate for false statements contained in documents signed by that same supervising attorney.

Moreover, even if Mr. Cohen was not fully aware of the disclosure requirements in Bankruptcy Code Section 327(a) and Bankruptcy Rule 2014(a), the conflicts of interest were not unique to bankruptcy law.  Even outside of the bankruptcy setting, the simultaneous representation of Boehm, Balco, Haddon, Sarah, the Warmers Estate, the Tessie Warmers Trust, and Connelly Industries would be impermissible under the New York Disciplinary Rules.  DR 5-105 states in relevant part:

**DR 5-105 Conflict of Interest; Simultaneous Representation.**

A.  A lawyer shall decline proffered employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be affected by the acceptance of the proffered employment, or if it would be likely to involve the lawyer in representing differing interests….

B.  A lawyer shall not continue multiple employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests….

C.  In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if a disinterested lawyer would believe that the lawyer can competently represent the interest of each and if each consents to the representation and the advantages and risks involved.

D.  While lawyers are associated in a law firm, none of them shall knowingly accept or continue employment when any one of them practicing alone would be prohibited from doing so under DR 5-101 ["Conflicts of Interest –

Lawyer's Own Interests"], DR 5-105(A) or (B), DR 5-108 (A) or (B)
["Conflicts of Interest – Former Client"] or DR 9-101(B) ["Avoiding Even the
Appearance of Impropriety"] except as otherwise provided therein.

E.  A law firm shall keep records of prior engagements, which records shall be
made at or near the time of such engagements and shall have a policy
implementing a system by which proposed engagements are checked against
current and previous engagements, so as to render effective assistance to
lawyers within the firm in complying with DR 5-105(D).  Failure to keep
records or to have a policy which complies with this subdivision, whether or
not a violation of DR 5-105(D) occurs, shall be a violation by the firm.  In
cases in which a violation of this subdivision by the firm is a substantial factor
in causing a violation of DR 5-105(D) by a lawyer, the firm, as well as the
individual lawyer, shall also be responsible for the violation of DR 5-105(D).

Mr. Cohen's position is that he agreed to take the case, then assigned the details to his

associate, Mr. Wulfman, who failed to make the proper disclosures to the Court and to the other

parties in interest.  Mr. Cohen should have known, and was in the best position to know, that his

firm had multiple conflicts of interest that should have barred Cohen Estis from ever representing

the Debtors.  Moreover, under DR 5-105(D), the Cohen Estis firm as a whole is at fault for

maintaining a flawed "master database of current and former clients" that did not reveal that

Donald Boehm and the Warmers Estate were current clients.

This Court is sympathetic to Mr. Cohen's medical condition, as the Court is sympathetic

and accommodating to any person with a chronic illness. The existence of Mr. Cohen's condition

does not excuse the Cohen Estis firm's ethical obligations or the duty to disclose conflicts of

interest to the Court and United States Trustee as required by the Bankruptcy Code and Rules.

## III.  <u>Disgorgement</u>

The Court also directed Cohen Estis to disgorge the Retainer to the Chapter 7 Trustee, to

be held in escrow pending further order of the Court.  The Court has ordered the disgorgement

because, according to its current Rule 2016(b) Statement, Cohen Estis received the Retainer, and

Cohen Estis's fees have been denied in the case.  Thus, the Retainer sworn by Cohen Estis as

paid to the firm for work to be performed in the Chapter 11 cases must be returned to the entity

that furnished Cohen Estis with the Retainer.[14]

Deborah Weisman-Estis has objected that "there still must be a finding that a payment

was made by the Debtor so that the Court would have the jurisdiction to order disgorgement of

that payment to the Chapter 7 Trustee," and that the Court is unfairly relying "as the sole

evidentiary proof … a certification prepared by Mr. Wulfman, and signed by Mr. Cohen when he

was visually impaired". (ECF Docket No. 330, ¶11)  Ms. Weisman-Estis is correct that an

evidentiary hearing is necessary.  The Court's ruling preserves the right of all parties, including

Cohen Estis, to present evidence as to the source of the Retainer.  However, until Cohen Estis is

able to prove at trial its contention that Cohen Estis will effectively be disgorging the Retainer to

itself (ECF Docket No. 325, ¶15), Cohen Estis has no greater right to the Retainer than the

Chapter 7 Trustee (which claims the Retainer as property of the estate) or the Tessie Warmers

---

[14]   This is required, for example, under Section 329 of the Bankruptcy Code, which provides:

**§ 329. Debtor's transactions with attorneys**

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to –

   (1) the estate, if the property transferred –

      (A) would have been property of the estate; or

      (B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

   (2) the entity that made such payment.

There is no logical reason why payment should not also be returned to the entity that made it in a case where compensation is denied for failure to make disclosures required by Bankruptcy Code Section 327 and Bankruptcy Rule 2014, and for lack of disinterestedness pursuant to Bankruptcy Code Section 328(c).

Trust (which intends to intervene in these proceedings to prove that the Retainer belongs to it and is not property of the bankruptcy estate).

Ms. Weisman-Estis is incorrect when she contends that the Court is relying on any single document as the "sole evidentiary proof". Part of the problem is that Cohen Estis has made so many conflicting statements and inconsistent acts that it is impossible to determine to whom the Retainer should be disgorged until after the Court has had an opportunity to weigh the conflicting evidence and testimony as part of an evidentiary hearing. Cohen Estis now claims the Retainer was not a true retainer in the nature of advance payment for future work, but an internal credit of a "pre-petition fee earned on another matter not from the Debtor" (ECF Docket No. 325, ¶15). Although Ms. Weisman-Estis claims that the Retainer "was paid virtue of funds paid our law office by the Trustee of the Tessie W. Warmers Trust" (ECF Docket No. 330, ¶10) no documents have been submitted to the Court to show that the original transferor of the $68,500 check was "the Trustee of the Tessie W. Warmers Trust". Several of Cohen Estis's earlier statements are at odds with its current claim. For example, Cohen Estis indicated in the Engagement Letter that it would "require the retainer payment to continue to prosecute this matter" and that the $42,000 balance was required "within forth-five (45) days"; disclosed in the Second Rule 2016 Statement that it had in fact received $45,000 "compensation . . . for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case" from Donald Boehm; and thereafter inexplicably failed to apply to this Court for any fees for over a year after the bankruptcy case had been converted to Chapter 7, and only then in response to a lawsuit commenced by the Chapter 7 Trustee.

Given the foregoing, before determining to whom the Retainer should be disgorged, the

Court will hear any and all evidence on the issue from any interested party.  The Court will

welcome testimony from Mr. Cohen and Ms. Weisman-Estis at that time.

## <u>CONCLUSION</u>

The Court will issue an order sustaining its April 11, 2006 ruling and April 26, 2006

order, after reconsideration.  The Court will require Cohen Estis to turn over the full amount of

the Retainer to the Chapter 7 Trustee within 10 days of the date of the order and will schedule a

further conference on these matters for August 8, 2006 at 12:00 Noon.

Dated: Poughkeepsie, New York
     July 7, 2006

                                             __/s/ Cecelia Morris_____
                                                  U. S. B. J.